IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | NO. 3:15-CR-00496-L |
| JACOBO GEISSLER (a.k.a. JACOB GEISSLER) | |

## FACTUAL RESUME

In support of Jacobo Geissler's plea of guilty to the offense in Count 7 of the Superseding Indictment, Geissler, the defendant, Michael P. Gibson, the defendant's attorney, and the United States of America (the government) stipulate and agree to the following:

## ELEMENTS OF THE OFFENSE

To prove the offense alleged in Count 7 of the superseding indictment, charging a violation of 18 U.S.C. § 371, that is, Conspiracy to Introduce Misbranded Food into Interstate Commerce with Intent to Defraud and Mislead, the government must prove each of the following elements beyond a reasonable doubt:[1]

First: That the defendant and at least one other person made an agreement to commit the crime of introducing misbranded food into interstate commerce with an intent to defraud or mislead, as charged in the superseding indictment;

---

[1] Fifth Circuit Pattern Jury Instruction 2.15 (5th Cir. 2015).

Factual Resume—Page 1

Second:   That the defendant knew the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose; and

Third:   That one of the conspirators during the existence of the conspiracy knowingly committed at least one of the overt acts described in the superseding indictment, in order to accomplish some object or purpose of the conspiracy.

The elements of Introducing Misbranded Food into Interstate Commerce with an Intent to Defraud and Mislead, a violation of 21 U.S.C. § 331(a) and 21 U.S.C. § 333(a)(2), are as follows:[2]

First.   That the substance was a misbranded food;

Second.   That a person caused the introduction of, or delivered for introduction, into interstate commerce misbranded food;

Third.   That the food's label was false or misleading in any particular manner; and

Fourth.   That a person mislabeled the food with the intent to defraud or mislead.

---

[2] 21 U.S.C. § 343(a)(1); 331(a); 321(k), (m); O'Malley, Grenig & Lee, Federal Jury Practice and Instructions, §§ 63:02, 63:03, 63:04 (6th ed.) (modified).

## STIPULATED FACTS

1. Jacobo Geissler admits and agrees that beginning in or around October 2008 and continuing thereafter until at least in or around August 2014, in the Dallas Division of the Northern District of Texas and elsewhere, the defendants USP Labs, and he and others working at USP Labs and S.K. Laboratories, namely Jonathan Doyle, Matthew Hebert, Sitesh Patel, and Cyril Willson, did knowingly and willfully combine, conspire, confederate, and agree to commit an offense against the United States, that is, to introduce misbranded food into interstate commerce with an intent to defraud and mislead, in violation of 21 U.S.C. § 331(a) and 21 U.S.C. § 333(a)(2).

2. The object of the conspiracy was to avoid law enforcement attention and match imported substances with false and misleading product labeling by importing and shipping in interstate commerce a variety of compounds for use and prospective use in dietary supplements with false labeling, rendering the items misbranded under 21 U.S.C. § 343(a)(1).

3. As part of the conspiracy, the co-conspirators identified a variety of potential dietary compounds that they wanted to test as prospective dietary supplement ingredients and use as actual dietary supplement ingredients. The co-conspirators ordered a variety of potential dietary compounds from a Chinese company as prospective and actual ingredients for use in dietary supplements, and instructed and agreed to have those powders labeled falsely as other food substances. The co-conspirators at USP Labs also sent a variety of potential dietary compounds to their co-

conspirators at S. K. Laboratories with the knowledge that the variety of potential dietary compounds were labeled falsely as other substances.

4. Geissler was the CEO of USPlabs, LLC and owned 45 percent of the company.

5. In November 2008, USP Labs began selling a dietary supplement called Jack3d, which was followed by a dietary supplement called OxyElite Pro in November 2009. Both Jack3d and OxyElite Pro originally contained a substance called 1,3-dimethylamylamine ("DMAA"), which is also known as methylhexaneamine. The DMAA used in Jack3d and OxyElite Pro was a synthetic stimulant manufactured in China. The DMAA USP Labs used was synthetic, meaning that it was made from chemicals in a factory, not obtained from nature.

6. Geissler and his co-conspirators came to understand that importing and selling purported natural, plant-based substances would be easier than selling synthetic stimulants— because regulatory agencies would be less likely to question the importation of plant extracts and because retailers would be more willing to sell a product that contained natural ingredients instead of synthetic ones.

7. USP Labs imported numerous substances intended for human consumption, such as DMAA, some but not all using false and fraudulent COAs and other false and fraudulent documentation and labeling. For example, in a September 2008 email, Patel instructed Geissler: "Have your supplier create a COA like this." Some of the false COAs the USP Labs caused to be created for DMAA shipments stated falsely that the

substance in the shipments had been extracted from the geranium plant using a "hydro-alcoholic" extraction method at a 200-to-1 ratio.

8. These statements were false because USP Labs used a synthetic stimulant from a Chinese factory, not a substance extracted from geraniums. In one email exchange from May 2009, Patel told Geissler and Doyle about the DMAA in their products: "lol stuff is completely 100% synthethic [sic]."

9. The DMAA-containing versions of Jack3d and OxyElite Pro became bestselling dietary supplements in the United States, generating hundreds of millions of dollars in sales.

10. In or around May 2010, USP Labs, Doyle, Geissler, and Hebert emailed and caused to be emailed to a dietary supplement retailer in New Jersey, false and fraudulent COAs and other statements falsely representing that USP Labs got the DMAA in its products from geranium plants.

11. In early 2012, about a month after the Department of Defense ordered DMAA-containing products pulled from GNC stores on U.S. military bases in order to conduct a safety review of those products, USP Labs provided a misleading answer to a dietary supplement industry publication when asked directly whether its DMAA was naturally sourced.

12. From at least 2008 until at least 2013, USP Labs also frequently imported other potential dietary compounds from China in smaller quantities and under false labeling to determine whether they could be used in new dietary supplements. USP Labs

used false labeling so that these test shipments could be mailed from China with no registration required and would not come under scrutiny by regulatory agencies.

13. On or about December 8, 2011, Geissler instructed a Chinese company via email to misbrand a shipment of nine different compounds (Norathyriol Annuloline, Aegelin, Tembamide, N-Benzoyltyramine, Alatamide, N-benzoyl tyramine methyl ether, N-(2-[3,4-dimethoxyphenyl]ethyl)-3,4-dimethoxyphenylacetamide, and Herclavine) sent from China to USP Labs in Texas.

14. One of the synthetic test potential compounds that USP Labs imported from China was called aegeline. The first aegeline-containing version of OxyElite Pro, which was called OxyElite "New Formula," went on sale in November 2012.

15. USP Labs reformulated the DMAA product in summer 2013 to contain aegeline and powder derived from a Chinese herb called cynanchum auriculatum. USP Labs did not perform any test to determine whether cynanchum auriculatum—as an extract, as ground-up roots, or otherwise—was safe or effective.

16. USP Labs agreed that a Chinese supplier would send pulverized roots of cynanchum auriculatum rather than an ethanol extract. The cynanchum auriculatum powder that USP Labs imported was much cheaper than an actual extract.

17. On or about June 15, 2013, Geissler instructed a Chinese company to have two metric tons of ground cynanchum auriculatum root powder shipped internationally to S. K. Laboratories in California for inclusion in USP Labs' products, using the false name "cynanchum auriculatum root extract." USP Labs sent false labels listing "cynanchum auriculatum (root) extract" as an ingredient in OxyElite Pro Advanced

Formula to retailers and wholesalers, even though that specific root extract was not present in the product. The cynanchum auriculatum-containing product, called OxyElite Pro "Advanced Formula," went on sale in or around August 2013.

18. As a result of the conspiracy described above, from in or around October 2008 through October 2013, the conspirators collected at least millions ~~$400,000,000~~ in revenue that they would not have obtained, absent the conspiracy. Conspirators USP Labs, Jacobo Geissler, Jonathan Doyle, and Matthew Hebert transferred millions ~~over $230,000,000~~ of the conspiracy proceeds from the USP Labs business account at Chase to the USP Labs Charles Schwab accounts. Once received in the USP Labs Charles Schwab accounts, transferred over $154,000,000 to at least 21 other financial accounts maintained at Charles Schwab, Chase Bank, TD Ameritrade Bank, TD Bank, and Bank of America, some in the name of business entities. The accounts containing fraud proceeds include, but are not limited to, the following:

    i.    All funds, monies, and things of value contained in Account #2102-2960, in the name of Jacob E Geissler at Charles Schwab.

    k.    All funds, monies, and things of value contained in Account #2618-3391, in the name of JG Ventures LLC at Charles Schwab.

    l.    All funds, monies, and things of value contained in Account #5211-4965, in the name of JG Ventures LLC at Charles Schwab.

    m.    All funds, monies, and things of value contained in Account #3682-0734, in the name of Geissler Investments LLC at Charles Schwab.

    n.    All funds, monies, and things of value contained in Account #4318-2228, in the name of Geissler Investments LLC at Charles Schwab.

o. All funds, monies, and things of value contained in Account #3633-3489, in the name of Geissler Investments LLC Portfolios at Charles Schwab.

p. All funds, monies, and things of value contained in Account #3949-6550, in the name of JEG Investments LLC at Charles Schwab.

q. All funds, monies, and things of value contained in Account #4148-9742, in the name of JEG Investments LLC at Charles Schwab.

r. All funds, monies, and things of value contained in Account #8237-4961, in the name of JEG Investments LLC Portfolios at Charles Schwab.

s. All funds, monies, and things of value contained in Account #9868-1193, in the name of JEG Investments DE LLC at Charles Schwab.

t. All funds, monies, and things of value contained in Account #8265-7257, in the name of JEG Endeavors at Charles Schwab.

u. All funds, monies, and things of value contained in Account #3506-2445, in the name of GS-ETH LLC at Charles Schwab.

v. All funds, monies, and things of value contained in Account #1585-2243, in the name of ETH Insurance Company Inc. at Charles Schwab.

w. All funds, monies, and things of value contained in Account #5995-7559, in the name of Straight CH Insurance Inc. at Charles Schwab.

x. All funds, monies, and things of value contained in Account #7812-4442, in the name of BFB Insurance Company Inc. at Charles Schwab.

y. All funds, monies, and things of value contained in Account #1827-5797, in the name of M19 Eleven Insurance Company at Charles Schwab.

z. All funds, monies, and things of value contained in Account #6887-5723, in the name of RB Investments DE LLC at Charles Schwab.

bb. All funds, monies, and things of value contained in Account #5253-5132, in the name of RB Investments DE LLC at Charles Schwab.

  cc. All funds, monies, and things of value contained in Account #9140-2357, in the name of Charitable Fund-Jacob and Ruth Donor at Charles Schwab.

  ll. The real property located at 3538 Miles St., Dallas, Dallas County, Texas, more specifically described as Lot 16B, Block 6/2467 of Bowser-Miles Addition, an Addition to the City of Dallas, Dallas County, Texas, according to the Plat thereof recorded in Volume 2001122, Page 2013, Map Records, Dallas County, Texas.

19. Additionally, Geissler purchased the following vehicles with fraud proceeds:

  oo. 2013 Ford F150, VIN 1FTFW1R67DFB97578.

  pp. 2013 Mercedes Benz ML350, VIN 4JGDA5JB2DA168066.

  qq. 2013 Mercedes Benz S63, VIN WDDNG7EB0DA511749.

20. The defendant agrees that the defendant committed all the essential elements of the offense. This factual resume is not intended to be a complete accounting of all the facts and events related to the offense charged in this case. The limited purpose of this statement of facts is to demonstrate that a factual basis exists to support the defendant's guilty plea to Count 7 of the superseding indictment.

AGREED TO AND SIGNED this 24th day of February, 2019.

ERIN NEALY COX
UNITED STATES ATTORNEY

ERRIN MARTIN
Section Chief

_____
JOHN J. DE LA GARZA, III
Assistant United States Attorney
Texas State Bar No. 00796455
1100 Commerce Street, Suite 300
Dallas, Texas 75242 214.659.8838

GUSTAV W. EYLER
Acting Director
Consumer Protection Branch

_____
Jacobo Geissler

_____
Michael P. Gibson
Attorney for Defendant

_____
PATRICK R. RUNKLE
Trial Attorney
Consumer Protection Branch
U.S. Department of Justice
P.O. Box 386
Washington, DC 20044-0386
202.532.4723

Factual Resume—Page 10